**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| CLARE LOCKE LLP, | ) | |
| | ) | |
| *Petitioner*, | ) | **Case No. 1:24-cv-00545** |
| | ) | |
| v. | ) | |
| | ) | **DECLARATION OF** |
| KYTCH, INC., | ) | **JEREMY O'SULLIVAN** |
| | ) | |
| *Respondent*. | ) | |
| | ) | |

<u>**DECLARATION OF JEREMY O'SULLIVAN**</u>

Pursuant to 28 U.S.C. § 1746, I, Jeremy O'Sullivan, declare and say as follows:

1.     I have personal knowledge of the matters set forth in this Declaration, and I am competent to testify as to them. I write this Declaration in support of Kytch's Opposition to Clare Locke LLP's Petition to Confirm Interim Arbitral Awards.

2.     I, along with Melissa Nelson, founded Kytch, Inc.

3.     We retained Clare Locke to represent us in November 2020 related to our dispute with McDonald's, Taylor Company, TFGroup, LLC, and J. Tyler Gamble (the "Defendants").

4.     Between November 2020 and November 2021, Kytch entered into three separate engagement letters securing Clare Locke's legal services.

5.     The first engagement letter—dated November 6, 2020—was for "pre-litigation defamation advice and counseling."

6.     The letter includes Clare Locke's standard hourly rates and the following "minimum fee payment" clause: "The minimum fee payment for this matter is $30,000. This means that if the number of hours we spend on the engagement do not total $30,000 we will include an adjustment to the invoice so the total legal fees for the matter equal the minimum fee."

7.      We signed the second engagement letter on April 28, 2021. The second engagement letter superseded the first, and Kytch agreed to pay Clare Locke "a $100,000 fixed fee" to prepare for and argue a preliminary injunction motion. Clare Locke also agreed to provide a 62.5% discount on its rates for the Kytch Litigations. In addition to these flat fee and hourly arrangements, Kytch agreed to pay between 25% and 35% "of the gross amount of any settlement or judgment" that Clare Locke obtained on its behalf.

8.      We signed the third engagement letter on November 29, 2021, and it is attached as **Exhibit A** and incorporated herein.

9.      Our primary point of contact at Clare Locke was Daniel P. Watkins, who resigned from Clare Locke on August 3, 2023, and founded his own law firm – Meier Watkins Phillips Pusch LLP.  About a week before Daniel resigned, Ms. Locke said that Clare Locke could no longer float our litigation expenses and she insisted that we obtain litigation funding. This was a marked reversal from Ms. Locke's previous representations that Clare Locke would cover litigation expenses until the Kytch Litigations ended. This infuriated me, and I considered terminating Clare Locke that day.

10.      Mr. Watkins led our litigation efforts in the preceding years, and his law firm was co-counsel with Clare Locke until we fired Clare Locke for cause on October 14, 2023. By that time, our relationship with Clare Locke was not salvageable. Approximately one month later, Clare Locke sent us three years of invoices to Kytch totaling almost $7,000,000.

11.      To my knowledge, Clare Locke attorneys deposed only three witnesses in the case. Daniel P. Watkins handled each of those examinations.

12.     In the fall and winter of 2023 and 2024, Mr. Watkins deposed dozens of witnesses, the parties exchanged written discovery and produced hundreds of thousands of pages of documents. We also briefed motions for summary judgment.

13.     I understand that Clare Locke initiated arbitration against us the same day that we attended mediation to try to resolve our litigation. After hours of negotiations, the mediator presented a proposal. One week later, we agreed, in principle, to resolve our claims for a confidential sum – presuming the parties could agree on, among other things, structuring of the settlement.

14.     We are still working to finalize the settlement terms.

15.     Kytch has notified Clare Locke that it agrees to wait forty-five (45) days to disburse any funds from the resolution of this or the other cases it has filed against the Defendants. Kytch is prepared to enter into a binding stipulation reflecting this agreement.

16.     Kytch made this agreement because it does not intend to "steal" anything, and Kytch is prepared to hold in escrow a portion of any funds it may receive in connection with resolving this case until Clare Locke's potential entitlement to any fees or expenses is resolved.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 30, 2024

JEREMY O'SULLIVAN

# EXHIBIT A



# CLARE LOCKE
### L L P

| | | |
|---|---|---|
| **THOMAS A. CLARE, P.C.** | 10 Prince Street | **ELIZABETH M. LOCKE, P.C.** |
| tom@clarelocke.com | Alexandria, Virginia 22314 | libby@clarelocke.com |
| (202) 628-7401 | | (202) 628-7402 |

(202) 628-7400

www.clarelocke.com

November 29, 2021

Via Email                                                                    **Legally Privileged and Confidential**

Mr. Jeremy O'Sullivan
Ms. Melissa Nelson
Kytch, Inc.
3327 Seldon Court
Fremont, CA 94539
Email: jeremy@kytch.com
melissa@kytch.com

     **Re:**  **Amended Engagement Letter for Legal Services**

Dear Jeremy and Melissa:

   We are very pleased that Kytch, Inc. ("you") has retained Clare Locke LLP ("the Firm," "we" or "us") to advise and represent you in your dispute with Tyler Gamble, J.L. Gamble Management LLC, TFGroup LLC, Taylor Commercial Foodservice, LLC DBA Taylor Company (collectively the "Taylor-affiliated Defendants"), and McDonald's Corp.  This amended engagement letter sets forth and revises the agreed-upon terms and conditions of our engagement that the parties intend to govern this matter, and it expressly amends and restates the terms of our April 28, 2021 engagment letter.

   <u>*Scope of Engagement:*</u>  The parties are entering into an agreement to secure the Firm's services to advise and represent you in prosecuting trade secret, Lanham Act, trade libel, tortious interference, and interference with business relations claims against the various adverse parties listed above.

   <u>*Fees and Expenses*</u>:  The type of matter for which you are retaining the Firm is one which can vary greatly, and unpredictably, in terms of the time needed to resolve the matter and the amount of attorney and paralegal hours involved.  To provide you with a degree of certainty as to the cost of the legal services performed within the scope of this engagement, you and the Firm have agreed to a



hybrid flat fee, contingency fee, and hourly arrangement in representing you as described more fully below:

1. You will pay $175,000 to cover all outstanding invoices for work done under the April 28, 2021 engagement letter related to the Taylor-affiliated Defendants and for other work done related to McDonald's, the current balance of which is $212,439;

2. Separately, and in lieu of hourly legal fees, you agree to pay a $50,000 fixed fee to cover work performed for the preparation and filing of the Amended Complaint against the Taylor-affiliated Defendants, and the preparation and filing of the Complaint against McDonald's Corp.

3. You agree to pay $50,000 fixed fee to cover our work to prepare for and argue any oppositions to any Taylor-affiliated Defendants or McDonald's initial dispositive motions.

4. For any work on the matter unrelated to or after the initial dispositive motions, we will give you a 70% discount on our hourly rates.  For example, we will provide these discounted rates for all discovery work we perform on your behalf, regardless of whether that work takes place before or after the filing or disposition of initial dispositive motions.

5. In addition to these fixed fees and hourly payments described above, and in exchange for the steep discounts we are providing, you agree that, in the event of any settlement or trial court judgment with a party, Clare Locke LLP is entitled to receive an additional contingency payment that is calculated based on the gross monetary amount of that settlement or trial court judgment.  Specifically, if a settlement or trial court judgment is achieved:

   a. For Taylor or any of the Taylor-affiliated Defendants on or before November 10, 2021, Clare Locke shall receive Clare Locke LLP shall receive a contingency payment equal to 30% of the gross amount of any settlement or judgment related to the Taylor-affiliated Defendants;

   b. For Taylor or any of the Taylor-affiliated Defendants after November 10, 2021, Clare Locke shall receive Clare Locke LLP shall receive a contingency payment equal to 35% of the gross amount of any settlement or judgment related to the Taylor-affiliated Defendants;

   c. For McDonalds Corp on or before April 10, 2022, Clare Locke shall receive Clare Locke LLP shall receive a contingency payment equal to 30% of the gross amount of any settlement or judgment related to McDonald's Corp.;



    d. For McDonalds Corp after April 10, 2022, Clare Locke shall receive Clare Locke LLP shall receive a contingency payment equal to 35% of the gross amount of any settlement or judgment related to McDonald's Corp.

So that you can make an informed decision in agreeing to the fixed fee amounts and hourly portions set forth herein, the Firm is disclosing that the hourly rates for the attorneys expected to work on this matter are as follows: Tom Clare and Libby Locke's hourly rates for are each $1,250 per hour and Daniel's hourly rate is $775. Other attorney's hourly rates range from $525 to $1,050 per hour. For the fixed fee portions of this matter, we will not bill you for hourly time or provide you with monthly invoices detailing the amount of attorney and paralegal hours spent on this matter, though we may maintain such records for internal tracking purposes or to seek legal fees as permitted under the law. The discounts detailed above will be applied to these hourly rates for the hourly portions of this matter.

In addition to our legal fees, clients are billed for disbursements made by the Firm, including expenses related to providing services. Such expenses may include photocopying, printing, scanning, witness fees, travel expenses, filing and recording fees, certain overtime, postage and messenger charges, deposition costs, computerized legal research, other computer services, and miscellaneous other charges. Expenses are not part of the fixed fee agreement for attorney and paralegal time described above, and you will be invoiced monthly for any such expenses. For your reference, we have enclosed our statement of client reimbursable expenses.

Clare Locke LLP is a boutique law firm providing highly specialized defamation advice and counseling not readily available from other law firms. Because there is no "silver bullet" or "standard playbook" in how to respond to media crises, our experience tells us that soliciting input from our highly-trained team on complex problems often results in the most effective solution. Accordingly, our Firm takes a collaborative approach toward achieving our client's goals, which sometimes includes team strategy meetings, multiple attorneys reviewing work product, and/or multiple attorneys attending hearings or depositions. In addition, given our practice and the established infrastructure our Firm has adopted, many of the specific billing and administrative requirements set forth in corporate billing guidelines or outside counsel policies, which are geared toward large law firms, do not apply to the kind of specialized legal services our Firm will be providing. Therefore, to the extent there is any conflict between the provisions in this engagement letter and any requirements in your billing guidelines or outside counsel policies, this engagement letter shall apply.

_Waivers and Confidentiality_: Clare Locke LLP is a general services law firm that represents numerous clients across a variety of industries. Because of the types of clients Clare Locke LLP advises and the types of engagements in which we are involved, we may be requested to act for other persons on other matters where the interests of the other persons may be adverse to you or your affiliates in this or other matters. Given this, without a binding conflicts waiver, conflicts of interest



might arise that could deprive you or other clients of the right to select Clare Locke LLP as their counsel.

In undertaking our representation of you, we want to be fair not only to your interests, but also to those of our other clients. Because you are engaged in activities in which your interests may diverge from those of our other clients, the possibility exists that one of our clients may take positions adverse to you in a matter in which such other client may have retained us. Accordingly, as an integral part of this engagement, you agree that Clare Locke LLP may, now or in the future, represent other entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to you or any of your affiliates on matters that are not substantially related to the legal services that Clare Locke LLP has rendered, is rendering, or in the future will render to you under this engagement. You also agree that you will not assert that Clare Locke LLP's representation of you or any of your affiliates in any past, present, or future matter is a basis to disqualify Clare Locke LLP from representing another person or entity.

Of course, this letter does not relieve us from our professional obligation to retain in confidence any confidential information obtained from you or your affiliates and to refrain from using or disclosing such information in connection with any other representation we may undertake. Provided that we adhere to these obligations, you agree that you will not assert that our possession of such information, even though it may relate to or be relevant to a matter in which we represent another client, prevents Clare Locke LLP from representing another of its clients. By the same token, to the extent permitted by applicable law or rules, you acknowledge that Clare Locke LLP may possess information derived from other client engagements that may be relevant or material to this engagement but that we will be prohibited by the rules in the applicable jurisdiction from disclosing to you, using for your benefit, or using to inform our advice to you.

Finally, you agree that our representation is of you individually and that no other person or entity has the status of client for conflict of interest purposes.

*Document Retention*:  At the completion of this engagement, you may request (subject to any attorney's lien to which we may be entitled) the return of any documents, discovery materials, or other property obtained from you that are in our possession and the delivery to you of the client file generated in the course of the work. In the absence of such a request, we will generally retain in paper or electronic form important material for a limited period of time that will vary based on the nature of the matter and materials and on the likelihood that you or we will need to further access them. When we decide not to retain materials related to our engagement, we may destroy them without further notice to you. In general, we will feel free to destroy the client file beginning five years after our engagement on a particular matter ends, and other materials sooner. We recommend that you submit a written request for your client file promptly upon conclusion of a matter.



*Consent to Use of Information*:   In connection with future materials that, for marketing purposes, describe facets of our law practice and recite examples of matters we handle on behalf of clients, you agree that, if those materials avoid disclosing your confidences and secrets as defined by applicable ethical rules, they may identify you as a client, may contain factual synopses of your matters, and may indicate generally the results achieved.

*Termination*:   You and we are free to terminate our representation at any time (unless judicial approval is required for us to withdraw).   Subject to any applicable court rules, we may terminate our representation if you fail to honor the terms of our representation, including those terms set forth in this letter, or where termination is permitted or required by applicable rules.   Our attorney-client relationship otherwise will end upon completion of the matter to which this engagement letter applies, or at such time as it reasonably appears that the need for our services in connection with the matter has ended, unless we agree to continue the representation on other matters.   You will remain liable to pay all fees and disbursements incurred up to the date of termination.   In addition, if either party terminates this engagement more than 30 days before any settlement or judgment, you will be liable to pay our hourly fees in quantum meruit.   The parties parties expressly agree that the hourly rates set forth in the "Fees and Expenses" paragraph are reasonable for purposes of any quantum meruit analysis.   If either pary terminates this engagement within 30 days of any settlement or judgment, you agree that the Firm is entitled to its contingency portion of any settlement or judgment the fullest extent permitted by law and may assert a lien upon the proceeds of a recovery to the fullest extent permitted by law.

*Foreign Lawyer Disclosure*:   Clare Locke LLP attorneys are not licensed to practice law in states that are not listed below.   Tom Clare, Libby Locke, Joe Oliveri, and Dustin Pusch are licensed to practice only in Washington DC and Virginia.   Megan Meier and Andy Phillips are licensed to practice only in Washington DC, Virginia, and Illinois.   Daniel Watkins, Steven Harrison, and James O'Toole are licensed to practice only in Virginia.   Shannon Timmann is licensed to practice only in Washington DC and Florida.   Nick Brechbill is licensed to practice only in Washington DC and New York.   Amy Roller is licensed to practice only in Washington DC.   Dan Mauler is licensed to practice only in Washington DC, Virginia and Nebraska.

*Foreign Agents Registration Act*:   The Foreign Agents Registration Act (FARA) is a disclosure statute that requires persons acting as agents of foreign principals in a political or quasi-political capacity to make periodic public disclosure of their relationship with the foreign principal to the United States Department of Justice.   The Firm's representation of foreign nationals and/or non-U.S. entities may trigger FARA disclosure requirements.   If the Firm believes that its representation of you may implicate FARA disclosure requirements, the Firm may consult with FARA counsel to evaluate whether the nature of the activities it has undertaken or will undertake on your behalf require such disclosure.   If FARA counsel or the Firm believe disclosure is advisable, the Firm will make disclosures required by U.S. law.   As part of this engagement, you acknowledge the possibility



that such disclosure may be required, and that the Firm may be legally obligated to disclose aspects of this representation publicly, including but not limited to the fact of the representation, the details of this retention agreement, the nature of the activities the firm has undertaken or will undertake on your behalf, and receipt and disbursement of funds related to those activities. You further agree that if the Firm undertakes a FARA disclosure related to our representation of you, you are responsible for the hourly fees and expenses of Clare Locke LLP personnel and the Firm's outside FARA counsel.

*Choice of Law*:  This agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Virginia without regard to conflict of law principles.

*Arbitration*:  Any controversy or claim arising out of or relating to this agreement or our representation of you in this or any future matter, including but not limited to any fee dispute or claim for malpractice, negligence, breach of fiduciary duty, or breach of contract, shall be settled by arbitration in Virginia administered by the American Arbitration Association. The arbitration shall be conducted in English. The designated arbitrator(s) shall have the authority to award any and all relief that would otherwise be available in a court of law, and judgment on any award may be entered in any court of competent jurisdiction. In addition, the designated arbitrator shall award reasonable attorneys' fees for any time Clare Locke LLP attorneys, paralegals, or outside counsel and its staff spend adjudicating the dispute provided that Clare Locke LLP is the prevailing party in the arbitration. The parties shall keep any such arbitration confidential and shall not disclose to any person, other than those necessary to the proceedings, the existence of the arbitration, any information, testimony, or documents submitted during the arbitration, and any award, unless and to the extent that disclosure is required by law or is necessary for permitted court proceedings, such as proceedings to recognize or enforce an award.

This arbitration clause means that you are forgoing your right to have any disputes that the clause covers resolved in a court of law and that you are forgoing any right to a jury. There are other differences between arbitration and court proceedings, and we encourage you to consult with separate counsel if you have any questions concerning this clause or any other matters in this letter.

*Entire Agreement*:  This letter sets forth our entire agreement for rendering professional services. It can be amended or modified only in a writing signed by both parties, and not orally or by course of conduct.



In order to memorialize our understanding, please sign and return a copy of this letter. Again, we are very pleased to have the opportunity to act for you on this matter.

Very truly yours,

CLARE LOCKE LLP

*Thomas A. Clare, P.C.*
_____
Thomas A. Clare, P.C.

*Libby Locke (Nov 29, 2021 16:04 EST)*
_____
Elizabeth M. Locke, P.C.

Agreed and accepted:

KYTCH, INC.

*Jeremy O'Sullivan*
Jeremy O'Sullivan (Nov 30, 2021 04:54 EST)
_____

*Melissa A. Nelson*
Melissa A. Nelson (Nov 30, 2021 09:38 PST)
_____



**Clare Locke LLP Client Reimbursable Expenses**

Clients are billed for disbursements made by the Firm with respect to matters undertaken for their account, which may be ancillary to our legal services. The following outlines Clare Locke LLP's standard charges for commonly incurred services and expenses:

- *Duplicating, Reprographics and Printing*:
  - ➤ Black/white copies, prints or scanned images:     $.10/impression
  - ➤ Color copies, prints or scanned images:     $.50/impression

- *Paralegal Charges*: Currently the Firm does not regularly use secretarial staff or administrative assistants, and instead, we opt to use a team of highly-trained paralegals who are integrally involved in the day-to-day management of our litigation and defamation matters, including actively managing our case dockets, litigation and client files, and litigation research, some of which necessarily includes "administrative" tasks. Our paralegals carefully track and bill their time, and clients are charged an hourly rate for these services.

- *Overtime Charges*: We generally do not bill our clients for overtime paid to our paralegals. But clients may be charged for overtime costs for paralegal staff, including one and a half times the staff person's hourly wages, overtime meals and travel expense, if, in the discretion of the Firm's partners, the nature of the work being done necessitates out-of-hours overtime and such work could not have been done during normal working hours.

- *Communication Expenses*: We do not charge for incidental phone calls or faxes, with the exception of third-party conference calls, videoconferences, or communications incurred at a third-party location.

- *Travel Expenses*: Clients are charged for our out-of-pocket expenses for travel, including any travel agency fees. For general aviation air travel, clients are charged the cost of a refundable coach commercial ticket to and from the destination.

- *Overnight Delivery/Postage/Messengers*: With the increasing use of electronic communications, the Firm attempts to minimize use of commercial delivery services. But where they are needed, we charge the actual cost of overnight delivery, postage, and third-party messenger services for materials mailed or sent on the client's behalf.

- *Research Services*: Clare Locke LLP's preferred legal research service is Westlaw. We do not charge for legal research that falls within our preferred pricing contract with Westlaw. If relevant research for a client cannot be obtained within the parameters of this agreement, we charge the actual cost of research conducted on Westlaw or through third-party research services.



- _Discovery Support Vendors_:  Clare Locke LLP uses a variety of litigation support vendors to collect, process, annotate, store and manage electronically-stored information for use in discovery and other aspects of the engagement.  These vendors generally charge either a flat monthly fee or a per-GB charge for their services.  We pass these costs through to our clients by charging either a pro-rated percentage of the flat fee based on your specific usage or for the actual GB used for your matter, as appropriate.

- _First-year Associates, Law Clerks, and Summer Associates_:  Due to the size of our Firm and to minimize the cost of services to our clients, we routinely rely on research and work product from our first-year associates, law clerks, and summer associates when, in the discretion of the Firm's partners, such work is appropriately designated to such a junior biller.  Clients are charged an hourly rate for their time commensurate with their seniority.  The Firm will, in the discretion of the Firm's partners, write off time for these more junior billers if the work performed exceeds the amount of time expected for the project or task.

- _Contract Attorneys and Contract Non-Attorney Billers_:  If there is a need to utilize a contract attorney or contract non-attorney on a client engagement, clients will be charged a standard hourly rate for these billers.

- _Expert Witnesses and Third-Party Consultants_:  If there is a need to utilize an expert witness or other third-party consultant on a client matter, clients will pay these individuals directly, even if Clare Locke LLP retains these individuals.

- _Third-Party Expenditures_:  Third-party expenditures incurred on behalf of a client will be passed through to the client at actual cost.  If the invoice exceeds $5,000, such charges will be billed directly to the client by the third party.

# 20211129 Kytch Lanham Act Retention Agreement[40][62]

Final Audit Report          2021-11-30

| | |
|---|---|
| Created: | 2021-11-29 |
| By: | Clare Locke LLP (admin@clarelocke.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA8VJya1qkzI3ecgQ-dFKyER35mRn5qxyP |

## "20211129 Kytch Lanham Act Retention Agreement[40][62]" History

📄 Document created by Clare Locke LLP (admin@clarelocke.com)
2021-11-29 - 8:49:07 PM GMT- IP address: 216.41.226.3

📧 Document emailed to Libby Locke (libby@clarelocke.com) for signature
2021-11-29 - 8:49:57 PM GMT

📄 Email viewed by Libby Locke (libby@clarelocke.com)
2021-11-29 - 9:03:03 PM GMT- IP address: 204.148.227.214

🖊 Document e-signed by Libby Locke (libby@clarelocke.com)
Signature Date: 2021-11-29 - 9:04:04 PM GMT - Time Source: server- IP address: 204.148.227.214

📧 Document emailed to Thomas A. Clare, P.C. (tom@clarelocke.com) for signature
2021-11-29 - 9:04:06 PM GMT

📄 Email viewed by Thomas A. Clare, P.C. (tom@clarelocke.com)
2021-11-29 - 9:56:05 PM GMT- IP address: 24.129.173.194

🖊 Document e-signed by Thomas A. Clare, P.C. (tom@clarelocke.com)
Signature Date: 2021-11-29 - 9:56:17 PM GMT - Time Source: server- IP address: 24.129.173.194

📧 Document emailed to Jeremy O'Sullivan (jeremy@kytch.com) for signature
2021-11-29 - 9:56:19 PM GMT

📄 Email viewed by Jeremy O'Sullivan (jeremy@kytch.com)
2021-11-29 - 11:07:03 PM GMT- IP address: 68.111.3.178

🖊 Document e-signed by Jeremy O'Sullivan (jeremy@kytch.com)
Signature Date: 2021-11-30 - 9:54:13 AM GMT - Time Source: server- IP address: 68.111.3.178

 Adobe Sign

Document emailed to Melissa A. Nelson (melissa@kytch.com) for signature

2021-11-30 - 9:54:15 AM GMT

Email viewed by Melissa A. Nelson (melissa@kytch.com)

2021-11-30 - 5:37:42 PM GMT- IP address: 96.47.237.10

Document e-signed by Melissa A. Nelson (melissa@kytch.com)

Signature Date: 2021-11-30 - 5:38:17 PM GMT - Time Source: server- IP address: 96.47.237.10

Agreement completed.

2021-11-30 - 5:38:17 PM GMT

**Adobe Sign**

# EXHIBIT B



Jeremy O'Sullivan
Melissa Nelson
Co-Founders
Kytch, Inc.
jeremy@kytch.com
melissa@kytch.com

Elizabeth M. Locke, Esq.
Clare Locke LLP
10 Prince Street
Alexandria, Virginia 22314

October 14, 2023

Dear Libby:

Our relationship has deteriorated beyond repair.

We came to Clare Locke seeking justice and accountability against the egregious, brazen, and unapologetic actions of McDonald's, Taylor, and their co-conspirators, who illegally destroyed the millions of dollars of value that Kytch created. Clare Locke had a reputation as a fierce advocate for clients that wouldn't back down from anyone. At the time, we saw you as a partner, with the necessary ferocity to hold the bad guys accountable. But, in your role as our attorney, you have only abused our trust to exploit us when we were in our most vulnerable state. You have become a more monstrous adversary than the defendants we hired you to fight. The past several months demonstrated that you are not acting in our best interests.

We have asked you to keep us updated about developments in the litigation and fight on our behalf. But we have been kept in the dark, excluded from key strategic decisions, and even our most basic requests—such as sharing documents with co-counsel— have been ignored, in what can only be interpreted as a display of dominance and disregard for Kytch's welfare. We have instructed you to push forward with discovery so that we could keep our November 2023 trial date. But throughout August and September, you canceled depositions without consulting us and refused to retain any expert witnesses despite the fast-approaching disclosure deadlines. We asked you to collaborate with Daniel Watkins, as co-counsel, so that we are not prejudiced by his departure from your firm. But you have removed him from communications with adverse counsel and our other co-counsel, even though he knows more about this case than anyone else. Most recently, Daniel explained that Kytch was planning to transfer its ESI database to the Relativity platform and he asked for Clare Locke's assistance with the transfer. But you refused, first arguing with Daniel about it before pivoting to simply ignoring all communications about it from us and from Daniel.

You have not been carrying out your duties as our counsel. You've subordinated your highest mandate to serve your client in favor of your emotional and personal vendetta to bad-mouth co-counsel and force us into a predatory financial situation, so that Clare Locke could be the effective beneficiary of the entire value of the case. **This is beyond unacceptable**. In fact, Clare Locke's conduct is on par with the egregious actions of McDonald's, Taylor, and their co-conspirators, to use any means necessary, illegal, and unethical, to take everything we built. It's impossible to ignore how similar the two stories are. Taylor felt so powerful that in the face of minor embarrassment caused by their own incompetence that they put more effort into destroying Kytch instead of doing their job: making better ice cream machines. Similarly, Clare Locke's top priority has been retaliating against Meier Watkins and taking advantage of Kytch instead of properly serving the best interests of the client. **So, we are formally ending our relationship for cause, and voiding our engagement letter. Please direct all further communications about this issue to our counsel, Daniel P. Watkins of Meier Watkins Phillips Pusch LLP**.

I.   <u>Kytch—Reeling from Competitor's Attacks—Retains Clare Locke</u>

In November 2020, Kytch first retained Clare Locke following unexpected attacks from its competitors, which devastated its business. In our vulnerable state, we came to depend on the firm and you to defend us and counsel us. As a result, Kytch trusted that you and the firm would always act in Kytch's best interest, and we rarely questioned your recommendations. We later learned that this was a grave mistake.

In November 2021, six months into the Alameda County litigation and one year after Clare Locke began representing us, you sent us an updated engagement letter that required Kytch to pay Clare Locke 35% of its gross recovery, plus hourly fees and $275,000 in various flat fees.[1]   This fee arrangement was extraordinary—entitling Clare Locke to well over 35% of what Kytch would eventually recover—but, believing the matter would be resolved quickly, trusting in your reputation and still believing you had our best interests at heart, we agreed.

However, we were completely upfront and frank with you and explained that we had no ability to pay any litigation expenses because our business was basically defunct based on the unfair competition from the defendants. You responded—in no uncertain terms—that Clare Locke would shoulder the litigation expenses through trial, and it would recoup those funds from any settlement that we obtained at the end of the case. We addressed this concern head on before signing the engagement letter when we were struggling to pay local counsel. The engagement letter also says that Kytch "will be

---

[1] $175,000 to cover past due legal fees, a $50,000 flat fee to draft federal complaints against Taylor and McDonald's, and a $50,000 flat fee to oppose certain dispositive motions filed by the Alameda County defendants.

invoiced monthly" for expenses and attorneys' fees. **But, to date, you have never sent any monthly invoices for expenses or fees—confirming your commitment to cover costs until the trial**.

II.   **In Spring 2022, Kytch and Clare Locke Investigate Litigation Funding**

At the beginning of 2022, litigation funders ████████████████████ ████████████ approached Daniel Watkins to discuss potentially funding our litigation. During discussions, Clare Locke first requested millions in funding to lower its downside risk.



Given Clare Locke's fee agreement (in which the firm would collect a 35% contingency **plus** the hourly fees **plus** the flat fees), we likely would not be able to repay the financing as well. It also was unfair that Clare Locke was pushing us to accept a deal that would basically remove its downside by guaranteeing millions of dollars in Clare Locke fees while the firm would still take more than 35% of the gross recovery in the case. This didn't make sense, especially since you had assured us that Clare Locke was going to carry our costs of the litigation through trial, without any mention of litigation funding.

III.   **Clare Locke Pressures Kytch to Obtain Litigation Funding by Claiming that the Firm Can No Longer Cover Essential Litigation Expenses.**

As the case progressed, almost all our discussions about the substance of the litigations were with Daniel Watkins and Amy Roller. Most of our talks with you revolved around Clare Locke's asserted mounting costs for the litigation. In early Summer 2023, on the eve of trial, you pushed us to immediately obtain litigation funding to help defray litigation expenses and secure cash to pay for Clare Locke's legal fees. We understand that you negotiated ████████████████ (supposedly) on our behalf. The reality, however, is that Clare Locke was devising a means to preserve its enormous upside while extracting cash in the immediate term to pad its downside. All at Kytch's significant expense, ████████████████. This arrangement all but guaranteed that Kytch would surrender what little remained from the potential proceeds .

Because of our concerns, we spoke with Daniel on July 25, 2023, about the litigation funding. He emailed us later that day and explained how much we owed Clare Locke and sent us various repayment scenarios under ████████████ proposed financing terms. We shared with him our concerns about the predatory nature of the financing, when taken into account with the significant Clare Locke contingency fee. We understand that he relayed our thoughts to you.

Our next conversation with you was on July 27, 2023, when we had a call to discuss our objections to the funding proposal. During that call, you told us that Clare Locke was unable to continue to carry the litigation expenses – transcript fees, travel, hotels, etc. You also said that you were not able to retain the experts we needed unless Melissa and I agreed to the funding. By that time, you had all the power in the relationship and we had none. Given that Kytch depended on you to advance and finance the litigation, we were at your mercy and your refusal to continue at this late date put us in a serious bind.

I responded by telling you that we were open to considering funding to pay for expenses, but it had become apparent that Clare Locke was engaged in self-dealing by pushing us into an arrangement designed to maximize the firm's profits and eliminate the firm's risks. It didn't make sense that Clare Locke was forcing Kytch to take out a high-interest loan to pay litigation costs and interim attorneys' fees to Clare Locke, while also retaining a 35% stake in Kytch's gross recovery. Contingency fees—particularly one as high as Clare Locke's—are intended to compensate attorneys for incurring **risks**; but you had none. Clare Locke devised an arrangement that had the best of both worlds: the upside of a risk based contingency fee with the risk-free guarantee of immediate payment. Moreover, the arrangement would have meant that **Kytch would walk away with just a small fraction of the recovery, if anything at all**.

Accordingly, it felt like we were dealing with a shark and that you were more interested in leveraging this situation for your benefit, instead of being our partner and making a deal that makes sense for everyone.

This was the beginning of the end of our relationship.

IV.     <u>Clare Locke Refuses to Cooperate with Co-Counsel, Cancels Depositions, Fails to Retain Necessary Experts, and Ignores Express Client Instructions.</u>

We understand that Daniel Watkins resigned one week after our call about funding and that—for personal reasons—you were angry about his departure. After he resigned, he told us that he would work to make sure that the transition went smoothly. Because of his role as lead attorney, he knows more about the case than anyone. (You acknowledged this when you insisted that Daniel defend Ron Sege's deposition.) Daniel said he was happy to work alongside Clare Locke and Irell & Manella – at no cost – to assist with the summary judgment filing and any other issues that came up in the case. Our conversations with Jason Sheasby were similar, as Jason made it clear that his loyalties lie with Kytch and that he was ready and willing to work with co-counsel to move the case forward.

By contrast, you told us that we shouldn't trust Daniel to represent us because he's a "bad writer" and otherwise not a good lawyer. You also said that you were not willing to work with Daniel or his new firm under any circumstances because of your personal animosity and apparent inability to control your emotions or set them aside to behave professionally. You were true to your word, embarking on a campaign to throw up roadblocks and hinder our progress. Even though Daniel remained counsel of record in both of our litigations, you arbitrarily refused to respond to Daniel's emails requesting updates and offering to help.

You began cancelling depositions and stopped authorizing any work that required the expenditure of money, such as new interstate subpoenas under the interstate discovery act. Additionally, you refused to engage an expert witness to testify about Taylor's false safety claims or the proprietary nature of our trade secrets, effectively dooming those claims to lose at summary judgment and making it impossible to comply with the then-upcoming expert disclosure deadlines. This posed a serious risk of catastrophe to Kytch, but you prioritized your own pocketbook.

Adding insult to injury, every time you talked to us in August and September, you have been singularly focused on Clare Locke receiving payment. Instead of strategizing with us about summary judgment motions or trying to move the case forward, you sent us a spreadsheet showing the outstanding fees for the first time on August 6, 2023, just three days after Daniel resigned.

We repeatedly asked you to give Daniel access to our case documents on Logicull and Box, but you repeatedly refused. Instead of just providing links and login-information to Daniel, you spent days (and countless attorney and paralegal hours) downloading files and putting them on a hard drive. You did this even though we instructed you to provide the files to Daniel and cooperate with him fully. When we raised this issue with you and flagged that you had given Jason Sheasby login access to our Logicull files, you blamed Daniel for giving him permission and you said that you never authorized it. But Clare Locke gave Jason access to Logikcull, six days *after* Daniel left the firm. When Daniel noted this fact, you pivoted and blamed Amy. Then, on September 5, 2023, we informed you that we were giving Daniel access to Melissa's Logikcull login so he could continue to prepare for depositions and draft our oppositions to the defendants' motions for summary judgment. You responded by restricting our ability to access our own documents and later having Daniel blocked from the platform.

When you sent Daniel a file download link from Logickull on September, Meier Watkins tried to download the file, but they couldn't complete the download because it was *367 GB*. As everyone knows, that is too large for a standard file download on a consumer wi-fi network or a standard workplace laptop—the link was effectively unusable. That same week, Logickull announced that it had just been acquired by

another ESI platform. Given the uncertainty of Logickull's future, Meier Watkins found a new ESI vendor who could both download the data and host it on a platform of Kytch's choice. We identified one and were advised that the downloaded data would be the best path forward, only to learn the download link had expired on September 8 (itself an inappropriate limitation given the technical complexity of downloading a file of that size, which should have been obvious).



Now you have been refusing to re-send the link since Daniel first asked on October 7, despite the fact that it should require nothing more than a click of a button. You first argued with Daniel and then ignored communications from him and from us. We now have to spend $11,000 in unnecessary temporary hosting costs to transfer the documents to a new Logickull database creating a new database export for the vendor—duplicating the work you supposedly already did and assuredly charged us for. This has also unnecessarily delayed the transfer process by weeks.

*** 

Instead of trying to resolve these issues by following our instructions and collaborating with Meier Watkins, you called us on September 4, 2023, to propose a "solution." You suggested that we forego trial and bring in your husband Tom Clare to force a favorable settlement against the defendants. This "solution" was just a means to accomplish Clare Locke's goal of blocking our representation with Meier Watkins and to keep your predatory control over Kytch. We still had not deposed any key witnesses and lacked any leverage to secure a settlement offer that would be high enough to resolve our claims. We have told you again and again that we want justice and accountability. We have concerns that your "solution" to settle is not motivated by the pursuit of our best interests, but rather Clare Locke's desire to immediately receive a payout despite its inability to litigate the case without Daniel and Amy.

Fortunately, Kytch's co-counsels' unwavering and professional behavior put in perspective just how erratic and abusive Clare Locke has behaved. For example, Jason Sheasby has declined any payment in recognition of Kytch's dire situation and inability to pay, exemplifying his commitment to his client and justice. Likewise, Daniel Watkins has embodied similar behavior. On the other hand, Clare Locke continues to distinguish itself with its erratic, abusive, and self-serving behavior, that again, can only be compared to Taylor.

Given all these events and your inability to move past your personal animosity against Daniel, we have developed concerns about the impact Clare Locke's involvement would have on the litigation. We've lost all confidence in your promises, capabilities, character, and your privileged position as our attorney. Our lives have been devastated by the abuse perpetrated by McDonald's, Taylor and their co-conspirators. But your actions are even worse: we trusted you to represent us and ferociously fight against the bad guys, not fight against us. Sadly, we've come to learn that you are truly a wolf cloaked as an attorney committed to justice. It's clear the cloak is now off. Accordingly, we must discharge your firm for cause and note that the hybrid-hourly contingency agreement, under which you receive both 35% of the proceeds and additional hourly and flat fees, is void because it does not comply with California law (or any other jurisdiction).

We reserve all rights and remedies connected to any damages that result from the conduct of you and your firm. Please immediately take steps to preserve, and not destroy, all communications regarding our engagement, litigation funding, litigation strategy, client retention efforts, and instructions or directives you have given related to the litigations, including but not limited to all communications between yourself and with your law partner Thomas A. Clare, whether recorded in writing, audio, or video and regardless of the location where the communication occurred.

Best,

Jeremy O'Sullivan                          Melissa Nelson