# EXHIBIT A

## DECLARATION OF JEREMY O'SULLIVAN

I, Jeremy O'Sullivan, hereby declare as follows:

1. I founded Kytch, Inc. in 2018. I am Kytch's Chief Executive Officer.

2. Throughout my years of interactions with Daniel P. Watkins, I have learned that he puts his own self-interest above all else. He worked to build trust, make himself central and indispensable to his clients, only to betray that trust for his own purposes. He has engaged in ethical misconduct of the most serious kind—including lying to me, his client. Mr. Watkins used his cunning to manipulate Kytch and ultimately used Kytch as a pawn in his scheme to get rich quickly off our case, knowing the vulnerable position he left Kytch in upon his strategically-timed departure from Clare Locke just a few short months before trial. And he used Kytch to retaliate and effectuate his vendetta against Clare Locke, and Ms. Locke in particular. In doing so, Mr. Watkins betrayed the trust he owed to his client, Kytch, and to his former partners and employer, Clare Locke. Kytch, like Clare Locke, put Mr. Watkins in a position of trust, only to have that trust betrayed at a time of deep vulnerability. I am appalled at the facts I have learned. No one should work with him or his firm, Meier Watkins Phillips Pusch LLP (MWPP). I do not believe Mr. Watkins is fit for the practice of law, nor should he be permitted to practice law for another day. If he is permitted to continue practicing law, I believe he will only induce another victim to place him in a position of trust and then hurt them like he did Kytch.

3. In November 2020, Kytch retained Clare Locke LLP regarding its dispute with Taylor Commercial Food Service and McDonald's. My initial and principal point of contact at Clare Locke was Elizabeth "Libby" Locke, a partner at the firm. She introduced me to Mr. Watkins, who at the time was a Clare Locke attorney. Mr. Watkins ended up being responsible for running much of the litigation day-to-day with Ms. Locke's oversight during the Kytch-Clare

Locke attorney-client relationship. Mr. Watkins quickly maneuvered himself into becoming the gatekeeper and information clearinghouse between Kytch and Clare Locke's other attorneys.

4.  Clare Locke worked up and eventually filed a number of lawsuits on Kytch's behalf, as well as work on a related Federal Trade Commission investigation, about the same core dispute. The cases included *Kytch v. Jonathan Tyler Gamble; J.L. Gamble Management, LLC d/b/a McDonald's; TFGroup, LLC, and Taylor Commercial Foodservice, LLC d/b/a Taylor Company,* in the Superior Court of the State of California for the County of Alameda, Case No: RG210099155; *Kytch v. McDonald's,* in the United States District Court for the Northern District of California, Case No. 3:23-CV-1998; and *Kytch v. Taylor Commercial Foodservice, LLC d/b/a Taylor Company,* in the United States District Court of Delaware, Case No. 1:22-cv-00606-MN, which was appealed to the United States Court of Appeals for the Third Circuit, Case No. 23-1810 (the "Kytch Litigation").

5.  I was pleased with Clare Locke's work on the Kytch Litigation, which was complex and hard fought, as well as the Federal Trade Commission investigation. Clare Locke devoted substantial time, energy, and capital to litigating our matter, and Ms. Locke, in particular, was aggressive in pursuing claims against the Kytch Defendants.

6.  Mr. Watkins positioned himself as Kytch's champion within Clare Locke. Starting in 2021, Mr. Watkins began disparaging Clare Locke's other attorneys, and Libby Locke in particular, and trying to drive a wedge between Clare Locke and Kytch. For example, around the fall of 2021, Mr. Watkins claimed that Libby Locke did not want to take the Kytch Litigation, and that Mr. Watkins was responsible for Clare Locke taking the case by persuading Tom Clare (another Clare Locke partner and Ms. Locke's husband) to do so over Ms. Locke's objection. I

2

have since learned that this claim by Mr. Watkins was just another fabrication to get Kytch to diminish its trust in Ms. Locke and transfer that trust to Mr. Watkins.

7. In 2023, Mr. Watkins insisted that aspects of Clare Locke's engagement letter with Kytch were predatory to Kytch, and he encouraged Kytch to research California ethical rules for lawyers regarding the enforceability of the Clare Locke engagement letter. I have since learned that Mr. Watkins drafted Clare Locke's engagement letters with Kytch, and in doing so, he researched and advised Clare Locke that the structure and terms of those engagement letters were fully enforceable and permissible under applicable ethical rules. In hindsight, Mr. Watkins's criticisms of the engagement letters were just another attempt to undermine Kytch's relationship with Clare Locke.

8. To further inflame the situation, in the spring of 2023, Mr. Watkins began telling Kytch not to take on any litigation funding to pay for fees or expenses in the case. He told us that Libby Locke and her law partner and husband, Mr. Clare, were wealthy, and Clare Locke would ultimately fund the litigation if we did not obtain litigation financing. We found this suggestion odd, because Kytch had planned to secure litigation financing from the early stages of Clare Locke's representation of Kytch. In mid-2022, Ms. Locke had aggressively negotiated a litigation funding deal with a litigation funder, which would have provided capital to pay for some of Clare Locke's legal fees and other litigation expenses, but before closing, Ms. Locke encouraged us to wait to prevent us from securing an expensive loan before it was necessary to do so. In doing so, she explained that once deposition discovery and expert discovery was imminent, and our trial was within a few months, we could obtain litigation financing and avoid an expensive multiplier. By providing Kytch this counsel, Ms. Locke put Kytch's interests before Clare Locke's, and we gratefully and willingly agreed to hold off on taking on such an expensive loan.

9. In early summer 2023, Kytch and Clare Locke began discussing the prospect of reengaging with litigation funding. Deposition discovery was approaching, Kytch needed to secure expert witnesses, and Kytch's first trial was scheduled for November 2023. Ms. Locke reopened a litigation funding deal with the litigation funder, which had earmarked significant funds for Clare Locke to pay for past-due attorneys' fees and litigation expenses that Kytch owed, and to finance future litigation costs.

10. On or about July 25, 2023, and certainly before August 3, 2023, Mr. Watkins advised me during a phone conversation that he was planning to leave Clare Locke for a new firm with some of his other Clare Locke partners. He said that he was indispensable and Clare Locke would need him to continue to be part of the Kytch Litigation, regardless of what was about to happen. Mr. Watkins said that he should not be telling me about this, because it was a violation of the ethical rules to disclose this information and to solicit Kytch for his new firm while he was still a Clare Locke partner. I was shocked and disappointed at this news. I asked Mr. Watkins not to leave Clare Locke, as it would hurt Kytch's case at a critical time. I offered to speak to Ms. Locke or others at Clare Locke to see if something could be done to dissuade him from leaving. Mr. Watkins said that was not possible, that his decision already had been made, and he and his partners' plans had been in the works for many months.

11. At the time, Kytch was close to finalizing the renegotiated litigation funding agreement with a litigation funder, which proposal had earmarked significant funds for Clare Locke to pay it for past attorneys' fees that Kytch owed it, and to finance future litigation costs. Mr. Watkins induced Kytch to delay closing on that litigation funding agreement until after he had changed law firms.

12. Mr. Watkins asked me not to share any of the information he had provided about his new firm, his move from Clare Locke, or his ideas for use of the litigation funding proceeds with Clare Locke until after he had publicly announced the move.

13. Given that I trusted Mr. Watkins at the time, I did as he advised, and did not divulge to other Clare Locke attorneys the information that Mr. Watkins had provided. I also acquiesced in Mr. Watkins's advice to put the closing of the litigation funding agreement on hold. Mr. Watkins confirmed in an email to Ms. Locke that Kytch had wanted to delay closing the litigation funding agreement; he did so by referencing an upcoming discovery deadline, but I believe the real reason to delay closing on the litigation funding agreement was that Mr. Watkins wanted to change firms and capture the litigation funding proceeds for his new firm rather than having them go to Clare Locke.

14. On the morning of August 3, 2023, Mr. Watkins announced his departure from Clare Locke to join his new firm, MWPP. A hearing in the Kytch Litigation had previously been scheduled for later that afternoon in which Mr. Watkins was scheduled to appear on Kytch's behalf. Mr. Watkins called me that day (without any other Clare Locke attorney on the line), advised that the move had been announced, and that we needed to speak with him, Mr. Clare, and Ms. Locke about what to do next. He directed that I should act natural on the call and behave as if Kytch was learning for the first time about Mr. Watkins's departure, even though he had already told Kytch about his planned departure with several of his then-Clare Locke partners. On the separate call with Mr. Watkins, Ms. Locke, and Mr. Clare, Mr. Watkins told me about the new firm (which Mr. Watkins had already revealed to me, though I did not disclose that fact on the call, at Mr. Watkins's behest).

5

15. Given that the hearing started in only a few hours, I agreed that Mr. Watkins should appear at the hearing that day for Kytch as originally planned. I further agreed to discuss his role and MWPP's role on the case going forward later in time. At the time, Mr. Watkins did not tell me or anyone else from Kytch that he and his MWPP colleagues had taken confidential documents from Clare Locke and its clients—including Kytch—at the time of their departures. Ms. Locke and Mr. Clare were professional to Kytch about the change and did not disparage Mr. Watkins or any of his MWPP partners about their abrupt departure from Clare Locke.

16. From then until early October 2023, Clare Locke gave Mr. Watkins and MWPP access to the Kytch Litigation file and remained Kytch's counsel. Clare Locke continued to perform excellent work for Kytch, including preparing significant summary judgment briefing after Mr. Watkins had abruptly left Clare Locke.

17. During this same time period, Mr. Watkins began to pressure Kytch to terminate Clare Locke as counsel, pressing the idea (based on misrepresentations from Mr. Watkins and Amy Roller, another Clare Locke attorney who eventually joined MWPP, about Clare Locke and its work) that Kytch no longer needed to compensate Clare Locke for its work on the Kytch Litigation. As part of that strategy, ▮▮▮▮ Watkins conceived of and drafted a "for cause" termination notice (the "Notice") to Clare Locke.

18. I understand that Mr. Watkins has claimed that Kytch directly or indirectly authorized him to access a Clare Locke Logickull database using his Clare Locke credentials on or about August 9, 2023. That is untrue. I never told Mr. Watkins to enter any Clare Locke database or system using his Clare Locke credentials after he departed Clare Locke, nor would I have wanted or expected him to do so as part of his work for Kytch. Any documents or information that Mr. Watkins or his MWPP colleagues needed was available through Kytch's access to

6

Logikcull or through Clare Locke, which I believe responsibly provided access to the Kytch Litigation file following Mr. Watkins's departure from Clare Locke. Mr. Watkins did not advise me that he had accessed Clare Locke's database using his Clare Locke credentials after he left Clare Locke. If he had suggested that he might do so, I would have instructed him not to.

19. Now, understanding that Mr. Watkins had accessed the Clare Locke Logikcull database using his Clare Locke credentials six days after his departure from Clare Locke without Clare Locke's permission, that Clare Locke's Logikcull database housed other Clare Locke client files, that Mr. Watkins had improperly comingled documents in Kytch's client file with documents of other Clare Locke clients on Clare Locke's document management system, and that Mr. Watkins and his MWPP partners had improperly taken Clare Locke client files and other documents with them to MWPP without either Clare Locke's or those clients' permission, I understand that Clare Locke had an obligation to ensure that Kytch and its other clients' files were protected from improper disclosure, and that they were transferred to Kytch in a timely manner consistent with Clare Locke's obligations to all of its clients. Looking back, I believe that Clare Locke faithfully engaged in that process and diligently provided Kytch with its client file given the difficult circumstances it faced as a result of Mr. Watkins' and his MWPP partners' misconduct.

20. From August 3 until October 3, 2023, Mr. Watkins intermittently worked with the litigation funder on a new arrangement that would pay MWPP rather than Clare Locke. Mr. Watkins also drafted the Notice, which he pressured Kytch to send to Clare Locke on multiple occasions. On October 3, 2023, Kytch finalized and signed the litigation funding agreement, which Mr. Watkins required Kytch to sign as a condition for MWPP to represent Kytch. In the final litigation funding agreement, funds previously earmarked for Clare Locke instead went to

7

MWPP; Clare Locke received nothing. Additionally, the final litigation funding agreement that Mr. Watkins pushed Kytch to sign was economically worse than the proposed litigation funding agreement that Ms. Locke had previously negotiated for Kytch. At Mr. Watkins's behest, Kytch finalized and entered into the litigation funding agreement without telling Clare Locke about the fact of the agreement or the change in its structure (with money going to MWPP instead of Clare Locke), even though Clare Locke was still representing Kytch at this time.

21. On October 14, 2023, we signed and sent to Clare Locke the Notice that Mr. Watkins had drafted, discharging Clare Locke as Kytch's counsel and purporting to revoke our Clare Locke engagement letter.

22. I signed the Notice upon the advice of Mr. Watkins and Amy Roller. I regret having done so. The Notice included statements drafted by Mr. Watkins that I believed to be true at the time, but I now know are false. The animosity directed toward Clare Locke in the Notice was a culmination of Mr. Watkins's multi-year campaign of misinformation about Clare Locke. Additionally, Mr. Watkins's strategy of trying to deny Clare Locke any compensation for three years of work was terrible advice and another example of him abusing his position of trust as a lawyer; it needlessly inflamed the relationship with Clare Locke, exposed Kytch to liability, and all but guaranteed that Clare Locke would end up pursuing Kytch to recover the fees and expenses it incurred in the Kytch Litigation. I now understand that Mr. Watkins and MWPP used the Notice as part of a vendetta against Clare Locke and an attempt to further hurt the firm from the MWPP departures. Kytch was a pawn in Mr. Watkin's and MWPP's scheme to hurt Clare Locke. Mr. Watkins needlessly weaponized Kytch's good faith and trust in him as a lawyer and to pursue to his malicious and unprovoked crusade against Clare Locke.

23. On behalf of Kytch, I fully and unequivocally retract the Notice as false. In particular, the following facts are true and accurate:

    a. In November 2020, Kytch retained Clare Locke and entered into an hourly fee agreement where we were obligated to pay Clare Locke $1250/hour for Ms. Locke's time and $775/hour for Mr. Watkins's time (among other billers). Under that agreement, Kytch was obligated to pay all expenses associated with the matter.

    b. In April 2021, Kytch decided to pursue litigation against Gamble, J.L. Gamble Management, Taylor, and TFGroup LLC (the "Taylor Defendants"), though not McDonald's at that time. This would require significantly more work from Clare Locke, and the then-prevailing terms of Kytch's engagement with Clare Locke would be too expensive for Kytch to pay in light of its precarious financial situation. Therefore, Clare Locke worked with Kytch and generated a new engagement letter and fee structure. Clare Locke proposed a hybrid fixed-fee/hourly-fee/contingency-fee agreement for the expanded scope of work. This new engagement letter reflected Clare Locke's belief in the strength of Kytch's claims and willingness to share risk and partner with Kytch on terms that Kytch could afford with litigation financing.

    c. In November 2021, after winning a preliminary injunction against one of the primary Kytch Litigation defendants, Kytch again wanted to expand the litigation to include claims against McDonald's and additional claims (for violations of the Lanham Act claims and speech-based claims) against

9

Taylor. Kytch and Clare Locke agreed to a revised engagement letter that reduced the flat fees, which benefited Kytch, and left in place the 70% discount on hourly fees in exchange for the contingency component (for which Clare Locke continued to bear substantial risk).

d. In 2022, Clare Locke discouraged Kytch from accepting an expensive litigation financing deal given that deposition and expert discovery were still some time off. Clare Locke, and in particular Ms. Locke, encouraged Kytch to defer taking on litigation financing until it would be necessary to fund necessary material litigation expenses. The litigation funding deal on the table at that time had time-based multipliers and transaction costs that made the financing expensive, especially if the litigation became prolonged. Kytch agreed on that path forward, deferring the litigation funding, which saved Kytch significant financing costs.

e. In Summer 2023, when trial was scheduled to begin just four months later, Clare Locke obtained and brought to Kytch a better litigation financing deal. This proposal did not pay all of Kytch's previously-incurred Clare Locke legal fees; instead, it would cover only a portion that would have covered only some past fees and legal expenses already expended, totaling approximately $375,000.

f. With full knowledge of the relevant facts, I now recognize that Clare Locke never asked or forced Kytch to enter into a worse deal for Kytch than the terms set forth in the November 2021 Clare Locke-Kytch Engagement Letter. Throughout the relationship, Clare Locke repeatedly put Kytch's

    financial interests above its own and agreed to modifications that put Kytch in a better position to succeed.

  g. Shortly after Mr. Watkins's departure from Clare Locke, Clare Locke offered to bring Mr. Clare in to help try or settle the case and expend additional Clare Locke attorney hours to revamp the Kytch trial team in an effort to help Kytch avoid an expensive litigation funding deal or agreeing to pay another contingency fee to successor counsel at MWPP. Mr. Watkins convinced Kytch to reject that proposal and instead hire MWPP.

24. Mr. Watkins's behavior in connection with his Clare Locke departure and moving our case to MWPP was not professional, as he wrote in the Notice. His behavior was in fact malicious. I now know that Mr. Watkins misrepresented to Kytch the impact of Kytch utilizing MWPP in the underlying litigation and terminating Clare Locke in the process. The move not only exposed Kytch to much higher attorneys' fees and expenses, but also materially weakened the litigation team and thereby the threat to the Kytch Litigation defendants, making it harder to achieve a valuable settlement. Mr. Watkins, in particular, misrepresented his competence and was insufficiently experienced to run our complicated case without supervision of the kind he had received at Clare Locke.

25. Through a series of false and misleading representations, Mr. Watkins and MWPP convinced Kytch to agree to pay MWPP a $500,000 flat fee plus a 20% contingency fee (net of fees) from any recovery in the Kytch Litigation. This fee is unconscionable, especially in light of the quality and depth of work that MWPP provided. With Kytch's flat fee in hand (paid with expensive litigation funding), MWPP failed to properly work up the case for trial and consistently made misrepresentations to Kytch. In March 2024, Mr. Watkins and his MWPP colleague, Amy

11

Roller, also used false pretenses to induce Kytch into accepting a settlement of the Kytch Litigation on unfavorable terms, and failed to present to the mediator in the Kytch Litigation important conditions that Kytch wanted to impose on a mediator's proposed settlement. Mr. Watkins's MWPP law partner, Megan Meier, participated in the mediation and the relevant communications concerning the mediator's proposal, whether to accept it, and on what terms; she, too, failed to protect Kytch or comply with my instructions.

26. Mr. Watkins and MWPP also misrepresented to Kytch the seriousness of the prospect of a legal dispute with Clare Locke and the consequences of signing the Notice that Mr. Watkins drafted. Mr. Watkins advised Kytch on these issues even though he had a clear conflict of interest given his own, personal stake in taking over the Kytch Litigation and his own disputes with Clare Locke.

27. The Notice that Mr. Watkins prepared and incited harmed Clare Locke and Kytch and created numerous complications in the Kytch Litigation that Mr. Watkins did not warn or advise Kytch before it was signed. Additionally, before the Notice was signed, I did not know that Mr. Watkins had surreptitiously accessed Clare Locke's database using his Clare Locke credentials without permission or that Mr. Watkins had taken without permission thousands of confidential Clare Locke and Clare Locke client documents with him when he left the firm. Had I known all the relevant facts at the time, I would not have signed or sent Clare Locke the Notice, and I sincerely regret doing so.

28. I wrote this declaration with the assistance of counsel of my choice.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of March, 2025.

_____
Jeremy O'Sullivan